# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

CASE NO.: 24-10014-B

---

CHASE GREGORY,

Appellant,

v.

TERRY DUKES, SR.,

Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

LT CASE NO.: 1:23-cv-45-AW-HTC

---

## APPELLANT'S INITIAL BRIEF

---

*/s/ Gwendolyn P. Adkins*



Gwendolyn P. Adkins
(FBN: 0949566)
gadkins@coppinsmonroe.com
jclark@coppinsmonroe.com
kwillis@coppinsmonroe.com
Coppins Monroe, P.A.
2316 Killearn Center Blvd., Suite 202
Tallahassee, FL 32309
Office: 850-422-2420   Fax: 850-422-2730

ATTORNEYS FOR DEFENDANT/APPELLANT
CHASE GREGORY

CHASE GREGORY v. TERRY DUKES, SR.

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, Appellant files the following alphabetical list of the trial judge, attorneys, persons, firms, partnerships, and corporations with any known interest in the outcome of this appeal:

1. Adkins, Gwendolyn P. (Attorney for Appellant and Defendants below);

2. Cannon, The Honorable Hope T. (United States Magistrate Judge);

3. Coppins Monroe, P.A. (Attorneys for Appellant and Defendants below);

4. Dukes, Sr., Terry (Plaintiff/Appellee);

5. Gregory, Chase (Defendant/Appellant);

6. McCallum, Jr., Sheriff Robert B. (Defendant);

7. Slater, James M. (Attorney for Appellee)

8. Slater Legal PLLC (Attorneys for Appellee);

9. Winsor, The Honorable Allen (United States District Judge).

## STATEMENT REGARDING ORAL ARGUMENT

Appellant, Deputy Chase Gregory, does not request oral argument. The issues raised by Deputy Gregory are adequately presented in the briefs and oral argument would add little to these proceedings.

## CITATIONS TO THE RECORD AND THE PARTIES

This Brief uses the following terms for the Parties and citations to the record:

1. Appellant, Defendant below, Chase Gregory shall be called "Deputy Gregory" or "Gregory."

2. Appellee, Plaintiff below, Terry Dukes, Sr. shall be called "Plaintiff" or "Senior."

3. Citations are to the document number of the electronic case filing system in the district court using this format: [Doc.__, p.__]. All documents referenced herein are contained within Appellant's Appendix.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ..................................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................... i

CITATIONS TO THE RECORD AND THE PARTIES ........................ i

TABLE OF CONTENTS.................................................................... ii

TABLE OF AUTHORITIES ............................................................ iv

STATEMENT OF JURISDICTION.....................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE & FACTS ............................................2

    I.    Procedural History..................................................................2

    II.    Standard of Review. ...............................................................3

    III.    The incident. ..........................................................................4

    IV.    Training. ...............................................................................16

    V.    Plaintiff's agency complaint against Chase Gregory ...........17

SUMMARY OF THE ARGUMENT .................................................18

ARGUMENT .................................................................................19

    I.    Deputy Gregory did not violate Plaintiff's Fourth Amendment rights when he entered his home..........................................20

        A.    Plaintiff's actions reasonably conveyed consent to enter his home. ...................................................................20

        B.    Deputy Gregory is entitled to qualified immunity. ...................28

            1. Overview of Qualified Immunity. ............................................28

            2. Case law clearly establishes that consent to enter a home may be implied by a resident's physical conduct, including opening a door and stepping aside to allow entry. ...................................31

    II.    Deputy Gregory did not violate Plaintiff's Fourth Amendment rights when he used a Taser on a noncompliant subject. ...................37

        A.    Deputy Gregory's Use of a Taser was reasonable in the circumstances. .........................................................37

        B.    Qualified immunity for use of Taser.........................................47

III.  Deputy Gregory did not violate Plaintiff's Fourth Amendment rights when he briefly detained Plaintiff. .............................................47

     A.  Plaintiff's brief detention was constitutionally justified...........48
     B.  Deputy Gregory is protected by qualified immunity for any improper actions related to Plaintiff's detention................52

CONCLUSION ...................................................................................................53
CERTIFICATE OF COMPLIANCE....................................................................53
CERTIFICATE OF TYPE SIZE AND STYLE ....................................................53
CERTIFICATE OF SERVICE ..............................................................................53

# TABLE OF AUTHORITIES

**Cases**

Almand v. DeKalb Cnty., Ga.,
103 F.3d 1510 (11th Cir.1997)...........................................................28

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ..............................................................................3

Anthony v. Coffee Cnty.,
579 F. App'x 760 (11th Cir. 2014)....................................................41

Ashcroft v. al-Kidd,
563 U.S. 731 (2011) ...........................................................................30

Barfield v. Rambosk,
641 F. App'x 845 (11th Cir. 2015) ....................................................41

Bashir v. Rockdale Cnty., Ga.,
445 F.3d 1323 (11th Cir. 2006)........................................................20

Behrens v. Pelletier,
516 U.S. 299 (1996) ..............................................................................1

Birchfield v. North Dakota,
579 U.S. 438 (2016) ...........................................................................22

Croom v. Balkwill,
645 F.3d 1240 (11th Cir. 2011)........................................................48

District of Columbia v. Wesby,
583 U.S. 48.........................................................................................31

Draper v. Reynolds,
369 F.3d 1270 (11th Cir. 2004)........................................................41

Fish v. Brown,
838 F.3d 1153 (11th Cir. 2016)........................................................32

Florida v. Jimeno,
500 U.S. 248 (1991) ..................................................................... 21, 26

*Fuqua v. Turner,*
  *996 F.3d 1140 (11th Cir. 2021)* ................................................................ *passim*

*Garczynski v. Bradshaw,*
  *573 F.3d 1158 (11th Cir. 2009)* ...................................................... 39, 45

*Gill as Next Friend of K.C.R. v. Judd,*
  *941 F.3d 504 (11th Cir. 2019)* ............................................................ *passim*

*Gomez v. United States,*
  *601 Fed. Appx. 841 (11th Cir. 2015)* ............................................... 50

*Gonzalez v. Lee Cnty. Hous. Auth.,*
  *161 F.3d 1290 (11th Cir. 1998)* .......................................... 29, 35, 36

*Graham v. Connor,*
  *490 U.S. 386 (1989)* ........................................................... 38, 41, 45

*Graham v. Gagnon,*
  *831 F.3d 176 (4th Cir. 2016)* ........................................................ 52

*Grider v. City of Auburn,*
  *618 F.3d 1240 (11th Cir. 2010)* .................................................... 3

*Hadden v. Loar,*
  *2016 WL 10520024 (S.D. Fla. Dec. 27, 2016)* ............................... 49

*Hammett v. Paulding Cnty.,*
  *875 F.3d 1036 (11th Cir. 2017)* .......................................... 27, 42, 45

*Helm v. Rainbow City,*
  *Alabama, 989 F.3d 1265 (11th Cir. 2021)* ................................... 39

*Hernandez v. Hansell,*
  *2016 WL 8943279 (M.D. Fla. 2016),*
  *aff'd, 695 Fed. Appx. 523 (11th Cir. 2017)* .......................... 4, 21, 27

*Holmes v. Kucynda,*
  *321 F.3d 1069 (11th Cir. 2003),* ..................................... 23, 24, 26, 32

*Hudson v. Hall,*
  *231 F.3d 1289 (11th Cir. 2000).* ................................................. 1, 50

v

*Illinois v. Rodriguez,*
    *497 U.S. 177 L.Ed.2d 148 (1990)* .........................................................................21

*Jackson v. West,*
    *787 F.3d 1345 (11th Cir. 2015)* ............................................................................27

*Jean-Baptiste v. Gutierrez,*
    *627 F.3d 816 (11th Cir. 2010)* ..................................................................... 37, 42

*Jiles v. Lowery,*
    *2023 WL 2017354 (11th Cir. Feb. 15, 2023)* ................................................. 22, 34

*King v. Pridmore,*
    *961 F.3d 1135 (11th Cir. 2020)* ..................................................................... 30, 52

*Lagasse, City of Waterbury,*
    *2011 WL 2709749 (D. Conn. 2011)* .....................................................................50

*Lee v. Ferraro,*
    *284 F.3d 1188 (11th Cir. 2002)* ............................................................. 29, 37, 38

*Leonard v. Silva,*
    *21-60627-CIV, 2022 WL 18493119 (S.D. Fla. Dec. 26, 2022), aff'd sub nom.*
    *Leonard v. Tony, 23-10244, 2023 WL 6142188 (11th Cir. Sept. 20, 2023)* ........44

*Long v. Slaton,*
    *508 F.3d 576 (11th Cir. 2007)* ............................................................................38

*Lynch ex rel. Lynch v. City of Mount Vernon,*
    *567 F. Supp. 2d 459 (S.D.N.Y. 2008)* ..................................................................50

*Michigan v. Summers,*
    *452 U.S. 692 (1981)* ...........................................................................................50

*Mitchell v. Forsyth,*
    *472 U.S. 511 (1985)* .............................................................................................1

*Mobley v. Palm Beach Cnty. Sheriff Dep't,*
    *783 F.3d 1347 (11th Cir. 2015)* ..........................................................................42

*Moore v. Gwinnett Cnty.,*
    *805 F. App'x 802 (11th Cir. 2020)* .....................................................................41

*Moore v. Pederson,*
  806 F.3d 1036 (11th Cir. 2015) ........................................................... 36

*Muehler v. Mena,*
  544 U.S. 93 (2005) ............................................................................... 49

*Navarette v. California,*
  572 U.S. 393 (2014) ............................................................................. 48

*Pair v. City of Parker FL Police Dept.,*
  383 Fed. Appx. 835 (11th Cir. 2010) .................................................. 28

*Patel v. City of Madison,*
  959 F.3d 1330 (11th Cir. 2020) ............................................................. 3

*Patel v. Lanier Cnty. Georgia,*
  969 F.3d 1173 (11th Cir. 2020) ..................................................... 29, 52

*Payton v. New York,*
  445 U.S. 573 (1980) ............................................................................. 20

*Pearson v. Callahan,*
  555 U.S. 223 (2009) ............................................................................. 29

*Penley v. Eslinger,*
  605 F.3d 843 (11th Cir. 2010) ............................................................. 39

*Quinn v. Zerkle,*
  2:21-CV-00421, 2022 WL 15316600 (S.D.W. Va. Oct. 26, 2022) ....................... 34

*Riordian v. Joyner,*
  2005 WL 752210 (D.Conn. 2005) ........................................................ 51

*Roberts v. Spielman,*
  643 F.3d 899 (11th Cir. 2011). ........................................................... 28

*Rodriguez v. Farrell,*
  280 F.3d 1341 (11th Cir. 2002) ........................................................... 49

*Santana v. Miami-Dade Cnty.,*
  688 Fed. Appx. 763 (11th Cir. 2017) .................................................. 36

*Saucier v. Katz,*
  533 U.S. 194 (2001) ............................................................................. 38

*Scott v. Harris,*
    *550 U.S. 372 (2007)* ............................................................................ *38*

*Shaw v. City of Selma,*
    *884 F.3d 1093 (11th Cir. 2018)* .......................................................... *45*

*Sheba Ethiopian Rest., Inc. v. DeKalb Cnty.,*
    *GA, 2023 WL 3750710 (11th Cir. June 1, 2023)* ................................. *30*

*Shepard v. Hallandale Beach Police Dept.,*
    *398 Fed. Appx. 480 (11th Cir. 2010)* ................................................... *43*

*Terrell v. Smith,*
    *668 F.3d 1244 (11th Cir. 2012)* ........................................................... *30*

*Torres v. Howell,*
    *2022 WL 1664355 (11th Cir. May 25, 2022)* ................................. *38, 41*

*United States v. Braddy,*
    *11 F.4th 1298 (11th Cir. 2021)* ..................................... *20, 26, 47*

*United States v. Clark,*
    *337 F.3d 1282 (11th Cir. 2003)* ........................................................... *50*

*United States v. Gonzalez*
    *71 F.3d 819 (11th Cir. 1996)* ..................................... *23, 24, 35*

*United States v. Hankerson,*
    *2022 WL 11771569 (M.D. Fla. Oct. 20, 2022)* ................................... *22*

*United States v. Johnson,*
    *608 Fed. Appx. 764 (11th Cir. 2015)* ................................................... *20*

*United States v. Mendoza-Gonzalez,*
    *318 F.3d 663 (5th Cir. 2003)* .............................................................. *21*

*United States v. Perkins,*
    *348 F.3d 965 (11th Cir. 2003)* ............................................................. *48*

*United States v. Philpot,*
    *2022 WL 1537988 (11th Cir. May 16, 2022)* ....................................... *48*

*United States v. Ramirez-Chilel,*
    *289 F.3d 744 (11th Cir. 2002)* ....................................... *passim*

*United States v. Stiner,*
    *551 F. Supp. 2d 1350 (M.D. Fla. 2008)*................................................................24

*Vaughan v. Cox,*
    *343 F.3d 1323 (11th Cir. 2003)*..............................................................45

*Vinyard v. Wilson,*
    *311 F.3d 1340 (11th Cir. 2002)*................................................... 28, 38

*White v. Pauly,*
    *580 U.S. 73 (2017)*..............................................................31

*Whittier v. Kobayashi,*
    *581 F.3d 1304 (11th Cir. 2009)*................................................... 36, 37

## Statutes

*Fla. Stat. § 768.28*................................................................2

*Fla. Stat. § 843.02*................................................................48

*Fla. Stat. §1983*................................................... 19, 26

## Other Authorities

*28 U.S.C. § 1291*................................................................1

*42 U.S.C. §1983)*................................................................28

## Rules

*Fed. R. Civ. P. 56(c)*................................................................3

*Federal Rule of Appellate Procedure 4(a)(1)*................................................1

## Constitutional Provisions

*U.S. Const. Amend. IV*................................................................20

## STATEMENT OF JURISDICTION

This case is an interlocutory appeal of the district court's denial of Deputy Gregory's motion for summary judgment based on the assertion of qualified immunity. [Doc.42]. The Eleventh Circuit Court of Appeals has jurisdiction to review the district court's denial of qualified immunity pursuant to Federal Rule of Appellate Procedure 4(a)(1) and 28 U.S.C. §1291. *See Behrens v. Pelletier*, 516 U.S. 299, 306 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Hudson v. Hall*, 231 F.3d 1289, 1293 (11th Cir. 2000). Deputy Gregory timely filed his Notice of Appeal on January 2, 2024 [Doc.44], following entry of the district court's Order on Summary Judgment. [Doc.42].

## STATEMENT OF THE ISSUES

Whether the district court erred by denying summary judgment/qualified immunity for Deputy Gregory on Plaintiff's claim of unlawful entry into a home without a warrant when, under the undisputed facts, a reasonable officer *could have* believed that Plaintiff's affirmative actions—including opening his door and retreating inside with the acknowledged intent of inviting someone inside— constituted implied consent to enter under the Fourth Amendment?

Whether the district court erred in denying summary judgment/qualified immunity for Deputy Gregory on Plaintiff's claim of unlawful use of force when the undisputed evidence demonstrated that in a fast developing and tense situation

involving the attempted arrest of a known violent felon, Gregory deployed his taser just once after Plaintiff retreated to a bedroom in close proximity to a handgun, failed to comply with verbal commands, and Plaintiff moved within reach of the handgun?

Whether the district court erred in denying summary judgment/qualified immunity for Deputy Gregory on Plaintiff's claim of unlawful detention where Plaintiff was temporarily detained for just fifteen-minutes following a tense situation to assess the situation and protect officer safety and where probable cause existed to believe that Plaintiff had committed the crime of obstruction?

## STATEMENT OF THE CASE & FACTS[1]

### I. Procedural History

This case was filed on March 1, 2023 [Doc.1] and all Defendants (the Sheriff and four individuals) timely answered. [Doc.5]. Upon agreement of the parties, Plaintiff filed a First Amended Complaint [Doc.11], and again all Defendants timely responded. [Doc.12]. Following the close of discovery, Plaintiff dismissed his claims against all individual defendants except Deputy Chase Gregory. Defendants Sheriff and Gregory moved for Summary Judgment as to all claims against them [Docs.26, 27, 28], and Plaintiff filed a cross-motion for partial summary judgment as to certain claims. [Docs.29, 30]. Both sides filed responsive and reply memoranda. [Docs.38, 39, 40, 41].

---

[1] The facts as stated herein are not admissions or stipulations for trial.

On December 22, 2023, the district court issued its order granting summary judgment in favor of Sheriff McCallum, granting in part and denying in part Deputy Gregory's Motion, and denying Plaintiff's motion for partial summary judgment. [Doc.42]. Deputy Gregory filed a timely notice of appeal on January 2, 2024. [Doc.44].

## II. <u>Standard of Review.</u>

A district court's denial of qualified immunity is reviewed *de novo*. *Patel v. City of Madison*, 959 F.3d 1330, 1336 (11th Cir. 2020). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Grider v. City of Auburn*, 618 F.3d 1240, 1246 n.1 (11th Cir. 2010).

Only disputed issues of *material* fact preclude summary judgment, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Substantive law identifies "which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. <u>Factual disputes that are irrelevant or unnecessary will not be counted</u>." *Anderson,* 477 U.S. at 248 (Emphasis added).

Though the facts must be viewed in a light most favorable to Plaintiff, it is only those facts <u>known to Deputy Gregory at the time</u> which are relevant. *See Hernandez v. Hansell*, 2016 WL 8943279, at *1 (M.D. Fla. 2016), *aff'd,* 695 Fed.

Appx. 523 (11th Cir. 2017) ("For purposes of summary judgment, the Court recites the facts in a light most favorable to Plaintiff and considers only those facts known to Defendants [ ] at the time of the incident.").

### III.   The incident.

In the early morning hours of Saturday, May 25, 2019, Levy County Sheriff's Detective Mike Wilkinson was called to a hospital in Gainesville, Florida, to meet with the victim of a domestic battery. [Doc.26-1, pp.2, 4, 5, 29-30]. Shaquanda Sheffield reported she was pregnant and had been violently beaten the night before by her boyfriend Terry Dukes Jr. at their residence at 900 Patterson Street, in Bronson (Levy County), Florida. [Doc.26-1, pp.6-7, 10, 29-30]. Ms. Sheffield warned that Dukes was smoking "Molly" and that there were firearms in the house. [Doc.26-1, pp.7, 13]. She advised the two were living at 900 Patterson Street, that she was afraid of Dukes, and that she wanted an injunction. [Doc.26-1, pp.6, 14]. Based on the victim's statements and his own observation of her injuries, including a bite on her face [Doc.26-1, pp. 7, 15, 29-30], Detective Wilkinson determined probable cause existed to arrest 31-year-old Terry Dukes Jr. ("Junior") for aggravated battery on a pregnant woman, a felony. [Doc.26-1, pp.11-12, 24-25, 31-32].

When probable cause exists for an arrest, the practice of the Levy County Sheriff's Office (LCSO) is to first attempt to locate the individual and effect the

arrest without a warrant.[2] [Doc.26-3, pp.34-35; Doc.26-2, pp.31-32]. This is more feasible when deputies have possible locations for the suspect and is a more efficient use of limited resources. [Doc.26-3, pp.34-35; Doc.26-2, pp.31-32]. If deputies are unable to locate the suspect within a reasonable time, the investigating deputy then seeks a warrant. [Doc.26-2, pp.31-32].

In accordance with this practice, Detective Wilkinson contacted the on-duty supervisor of the patrol division, Corporal Franco Almeida, and zone deputy Blake Murphy and asked them to go to the house at 900 Patterson Street and pick up Junior based on the probable cause for his arrest. [Doc.26-1, pp.12, 14; Doc.26-4, pp.4, 5]. Detective Wilkinson gave an officer safety briefing advising that Junior was violent, was using Molly[3], and that there were firearms in the house. [Doc.26-1, p.13; Doc.26-5, pp.3-4; Doc.26-3, pp.51-52]. Junior was also known to be a convicted felon. [Doc.26-4, p.6; Doc.26-6, p.17; Doc.26-7, p.38]. Detective Wilkinson believed it urgent to pick up Junior given the demeanor of the victim and Junior's

---

[2] This does not mean deputies enter residences at will. *See, e.g.,* Directive 801 "In the absence of *consent or exigent circumstances*, even though probable cause exists for an arrest, a search warrant shall be obtained before entry into a third party premises for the purpose of arrest." and 806: "Absent exigent circumstances, the deputy must obtain prior permission from a supervisor to forcibly enter the residence or enter without the consent of an occupant at the residence," and discussing limited circumstances of nonconsensual entries when serving *arrest warrants*. [Doc.26-12].

[3] Molly is a street name for MDMA, a drug Deputy Gregory describes as making the user unpredictable. [Doc.26-3, pp.47-48].

history of nine prior violent encounters which included batteries and weapons charges. [Doc.26-1, pp.14-15].

For officer safety, as many deputies as are available will respond in circumstances such as this. [Doc.26-3, p.49; Doc.26-5, pp.8-9]. Corporal Almeida and Deputy Murphy connected with Deputies Tucker Gaffey and Chase Gregory, related the information provided them by Detective Wilkinson [Doc.26-5, p.4; Doc.26-3, p.46], and discussed going to the 900 Patterson Street house to arrest Junior. [Doc.26-4, p.5; Doc.26-5, pp.3-4]. The uniformed deputies drove to the house in separate vehicles without lights or sirens and parked on the street in front of the house. [Doc.26-5, pp.5-6; Doc.26-3, pp.53-54]. There were no cars at the house and the house was dark. [Doc.26-5, pp.6, 12].

Corporal Almeida and Deputy Murphy approached the front door of the double-wide mobile home [Doc.26-5, p.6], while Deputy Gaffey positioned himself at the back northwest corner, and Deputy Gregory walked to the backdoor.[4] [Doc.26-6, p. 18-20; Doc.26-3, p.55]. The front door appeared to have items in front of it blocking the way in. [Doc.26-4, p.35]. Most of the windows of the mobile home

---

[4] Plaintiff has suggested the property was fenced and gated. If so, deputies have no recollection of them or of having to bypass such obstacles. [Doc.26-5, p.6 ("If there was, it would've been open."), p.11; Doc.26-4, p.7].

were open; it was dark inside. [Doc.26-7, pp.7, 41-42; Doc.26-5, p.6; Doc.26-6, p.20; Doc.26-3, p.67].

Standing on the porch at the top of the stairs, Deputy Murphy knocked loudly on the front door and loudly announced, "Sheriff's Office." He then knocked on the side of the house and again on the front door with the same announcement each time. [Doc.26-5, pp.6, 7, 11-12]. His flashlight was on. [Doc.26-5, p.10]. Deputies did not have their service weapons drawn. [Doc.26-5, p.13; Doc.26-3, p.65; Doc.26-6, p.27].

Inside the house, close to 6:00am, Plaintiff Terry Dukes, *Senior* was in his bedroom which has a window on the front of the house, to the left of the front door. [Doc.26-7, pp.6, 17-18]. He saw a flashlight in his window and heard a hard hit on the side of his trailer. [Doc.26-7, pp.8-9, 17, 19]. Plaintiff knew someone was at the house; the flashlight made him think it was his son coming home. [Doc.26-7, pp.8, 20]. But he also knew something was different; his son never hits the house. [Doc.26-7, pp.8, 17, 20]. Plaintiff verbally responded "real loud," including "I'm coming!" and went to the back door "to let him in."[5] [Doc.26-7, pp.8-9, 17]. Ordinarily –

---

[5] According to Plaintiff, he is hard of hearing and did not hear the first knock or the announcement of "Sheriff's Office." [Doc.26-7, p.8]. Because of the flashlight, he believed it was his son who had come home and he opened the door to allow him inside. [Doc.26-7, pp.8-9].

If Plaintiff is hard of hearing, this was unknown to Deputy Gregory who had previously engaged in conversation with him and never observed any sign of hearing impairment. [Doc.26-3, p.83].

"every single time" – Plaintiff answered the door with his gun in hand. [Doc.26-7, pp.14, 21]. This night something told him, "Just lay your gun on the bed," and he put his .38 special on the bed before he went to the door. [Doc.26-7, pp.14, 15, 21].

Plaintiff purposely did not turn on any lights, but walked from his room, through the "kitchen hall" about six feet to the back door, unlocked it, turned the knob and opened the door to allow his son to enter. [Doc.26-7, pp.7, 21-22, 24, 41]. He walked back to the room to get dressed. [Doc.26-7, pp.9, 21]. It was almost 6:00am, and he had to be at work at 7. [Doc.26-7, p.23].

From his position beside the handrail at the bottom of the backstairs, Deputy Gregory could hear Deputy Murphy's knocking and the announcements of "Sheriff's Office" at the front of the house. [Doc.26-3, pp.56, 61-62]. He heard footsteps and a voice inside, then the back door opened enough that Deputy Gregory could make out an individual but not his identity. [Doc.26-3, pp.57-58, 60, 62]. The individual immediately turned back into the house. [Doc.26-3, pp.57-58, 62].

Deputy Gregory believed Junior to be inside the house; he had no reason to expect Plaintiff, Terry Dukes, Senior. [Doc.26-3, p.66]. Any time Deputy Gregory had been to this house in the past, it had been for Junior. [Doc.26-3, pp.40-41]. He had never before seen Senior at the Patterson Street address and believed that Senior lived off of School Street. [Doc.26-3, pp.40, 41, and 59].

Deputy Gregory knew: deputies had probable cause to arrest Junior for a violent felony; Junior was known to live at this house and was reportedly at the house at this time; Junior was known to use drugs and reportedly was currently using Molly, a drug which makes the user unpredictable; uniformed deputies had knocked and announced their presence; a person inside the home was heard responding to the door following the announcement; a male unlocked and opened the door and returned back into the home; and there had been no show of force to coerce entry into the home. [Doc.26-3, pp.45; 56-58, 60, 61-62; Doc.26-11, ¶3]. Under the totality of the circumstances, Deputy Gregory interpreted the overt physical actions of the occupant as nonverbal consent to enter the home.[6] [Doc.26-11, ¶5; Doc.26-3, pp.88-

---

[6] Gregory knew from previous experiences that persons are very clear if they do *not* want law enforcement present, and that he had been given nonverbal consent in other situations. [Doc.26-11, ¶4]. He has been trained on Fourth Amendment law and understands consent to be a basis which allows law enforcement to enter a home without a warrant and that such consent may be nonverbal. [Doc.26-11, ¶6].

Paul Kiley, Director of the Police Academy for Miami-Dade College, and a member of the training committee with the Florida Department of Law Enforcement Criminal Justice Standards and Training Commission, reviewed the deputies' actions for the morning of May 25, 2019, and opined that it "was very reasonable for Deputy Gregory to understand the door being opened, after the banging and announcing Sheriff's Office, the open door was an invitation to enter." [Doc.27-1, ¶5]. He has personally experienced the opening of a door as a nonverbal invitation. [Doc.27-1, ¶4]. Most importantly, Kiley opines that the actions taken were within generally accepted police practices *taught at Florida police academies* as being within the bounds of the Fourth Amendment. [Doc.27-1, ¶13].

Then-Corporal Almeida opines that if someone opens a door for a deputy as an invitation into the home, a deputy is allowed to go in. [Doc.26-4, p.32].

9

89]. Deputy Gregory then crossed the threshold and entered the unlit home.[7] [Doc.26-3, pp.65, 69-70]. Gregory's gun was not drawn and his flashlight was not illuminated.[8, 9] [Doc.26-3, pp.63, 68].

From the backdoor, Deputy Gregory passed through the "kitchen hall" (a galley laundry and kitchen area) [Doc.26-3, p.75], where he could then see a male

---

Communications can occur without speaking. [Doc.26-4, p.33]. Based on the situation leading up to entry here – loud knocking and announcing, someone saying they're coming, and opening a door where a deputy is positioned, "it's common sense." "A reasonable person would believe they're letting us in." [Doc.26-4, pp.33-34].

"If a law enforcement, of any kind, especially uniformed law enforcement, knocks and announces at your door or there for a lawful reason, you come to the door, open it for us, and move so we can enter the home, that would be interpreted as being invited into the home." [Doc.26-4, p.36].

[7] There were no lights on in the house but there was sufficient ambient lighting that Gregory could see enough to walk and to see a male figure. [Doc.26-3, pp.67, 74-75]. Because there were no lights of any sort - clocks, stove, microwave - deputies believed there was no power to the home. [Doc.26-6, p.30]. Indeed, Plaintiff had to "run lamps to the room" because the switches were bad; the whole trailer needed rewiring. [Doc.26-7, pp.7, 28].

[8] Deputies refer to this as the fatal funnel and are trained not to illuminate themselves in these circumstances as it can make them a target with no place to go if someone begins shooting. [Doc.26-3, pp.68, 73-74].

[9] It was announced over the radio that Gregory and Gaffey had entered the house [Doc.26-3, pp. 64, 65, 71; Doc.26-5, pp.18-19], and from his observation of the door opening and Gregory entering, Deputy Gaffey believed consent had been given and he and Corporal Almeida soon entered too. [Doc.26-3, p.65; Doc.26-6, pp.23-24; Doc.26-4, pp.34-36].

about to walk through a doorway into another room. [Doc.26-3, pp.68-70, 71, 75-76]. Gregory again announced "Sheriff's Office" and ordered the individual to stop. [Doc.26-3, pp.68, 71, 72, 76]. The male ignored the command and continued through the doorway to the room and began closing the door.[10] [Doc.26-3, pp. 71, 76].

Deputy Gregory announced "Sheriff's Office" several times and asked for Junior. [Doc.26-3, p.77; Doc.26-6, p.27]. Gregory identified himself and his agency and instructed the male to identify himself. [Doc.26-3, pp.77-78]. Gregory knocked loudly on the bedroom door and gave several loud commands to show and identify himself. [Doc.26-3, pp.77-78]. The male did not comply but quickly peeked his head as if to see Gregory. [Doc.26-3, p.78]. Deputies were only able to see a portion of his face, they could not see enough to identify him.[11] [Doc.26-3, p.79; Doc.26-6,

---

[10] There is significant dispute between the parties as to whether the bedroom door was opened or closed after Plaintiff entered the room: all deputies say it was primarily closed, Plaintiff sometimes says it was always open, but also acknowledges, "If I did anything I might have pushed the door trying to get my pants because I was right behind the door." [Doc.26-9, p.8]. This fact is immaterial because regardless of the position of the door, there is no evidence deputies could sufficiently see the male to identify him as Senior until such time as the Taser was deployed and they drew closer to Plaintiff. [Doc.26-3, p.91]. For this reason, Deputy Gregory has eliminated further references herein to the position of the bedroom door.

[11] Plaintiff admits he and his son look alike in the face but they are different in size and contends Gregory knew him well enough to know the difference. [Doc.26-7, pp.38-39]. Gregory too admits he was sufficiently familiar with Dukes Junior and Senior that he would have known the individual was Senior *if he had been able to see his face.* [Doc.26-3, pp.79-80].

p.29; Doc.26-4, pp.10-11]. At one point, he stuck out his right arm enough that Gregory could see the individual was black and his voice told him it was a male. [Doc.26-3, pp.78, 81; Doc.26-6, pp.26-27; Doc.26-4, p.11]. Deputies Gregory and Gaffey were repeating commands for the male to show his hands. [Doc.26-5, p.14; Doc.26-3, pp.83-84; Doc.26-6, pp. 26-27; Doc.26-4, pp.10, 20]. When he continued not to comply and could not be identified, Deputy Gregory drew his service weapon. [Doc.26-3, pp.81-82; Doc.26-6, p.27; Doc.26-4, p.9]. Deputy Gaffey held his Taser. [Doc.26-6, p.27].

Deputy Gregory gave additional commands for the male to identify himself. [Doc.26-3, pp. 77-78, 82]. The male still did not comply but asked who Gregory was and why he was there. [Doc.26-3, p.82; Doc.26-4, p.10]. Gregory could still see only part of his face and part of his body. [Doc.26-3, p.82]. All deputies can now see a bed in the room and a gun laying on it on the left side, about five to eight feet from

---

At this time, Gregory believed that Senior lived at the house off of School Street close to Pine Street. [Doc.26-3, pp.40, 41, 59]. *After* this incident, Gregory learned that the Patterson Street address was owned by Senior and that the School Street home belonged to his twin brother. [Doc.26-3, p.40]. Although Sheffield told Detective Wilkinson that Senior also lived at the home, Wilkinson does not know whether he related this to the other deputies given everyone's familiarity with the home because of Junior. [Doc.26-1, pp.17-18].

Corporal Almeida and Deputy Gaffey did not know Senior. [Doc.26-6, pp.15-16; Doc.26-4, p.8]. Almeida had brief prior interactions with Junior at this same location; Gaffey had encountered Junior on one prior occasion. [Doc.26-6, p.16; Doc.26-4, pp.2-3].

the occupant. [Doc.26-3, pp.82, 91; Doc.26-6 pp.27, 28; Doc.26-4, pp.12, 15].

Gregory gave more commands to show both hands, the male still did not comply.

[Doc.26-3, pp.82-84; Doc.26-6, p.25].

From inside the room, Plaintiff looked and saw the green outfits of law enforcement, heard them hollering, and knew they were probably looking for his son, Junior. [Doc.26-7, pp.4, 10, 29]. He knew Junior had plenty of issues with the law, that he had problems with drugs (Molly in particular), and that he and Shaquanda fought and put holes in his walls. [Doc.26-7, pp.2, 3]. Junior was staying with him at the time but stayed out that night because he knew law enforcement was looking for him; any other time, he would come home. [Doc.26-7, pp.5, 6].

Deputies were hollering, "Get on the ground" and had guns pointed at Plaintiff.[12] [Doc.26-7, pp. 10, 27]. The deputies' commands were loud but Plaintiff knew *he* was "in no trouble" and "that's why [he] didn't get on the ground." [Doc.26-7 p. 27]. He got his clothes and his towel and was trying to get ready for work. [Doc.26-7, p.10]. He asked, "What's going on;" said, "My son is not here;" "I'm

---

[12] After the fact, Plaintiff mentioned that he had trouble hearing so deputies made certain to speak up so he could hear their conversation; however, none raised their voice nearly as loud as the verbal commands given by Deputy Gregory during the incident. [Doc.26-4, p.30]. In past communications with Senior, Gregory had never observed any sign of hearing impairment. [Doc.26-3, p.83]. Regardless, any difficulty hearing is immaterial as Plaintiff himself acknowledges he heard the deputies' commands.

Terry Dukes Senior." [Doc.26-7, p.10]. Plaintiff continued talking to the officers and said, "Y'all need to leave me alone," and "I'm trying to go to work." [Doc.26-7, p.11]. He kept talking to them and thought they would leave him alone but they kept on so he got on the ground and was trying to cover himself. [Doc.26-7, pp.29-30]. When he reached for pants, he was hit with a Taser. [Doc.26-7 p.12; Doc.26-9, p.7].

Apart from him asking why, what were they doing, and some reference to work[13], any words spoken by the male could not be understood by the deputies inside the home. [Doc.26-3, pp.77-78; Doc.26-6, pp.27-28; Doc.26-4, p.10]. The male moved in proximity to where the gun lay,[14] which Plaintiff admits was loaded and unholstered.[15] [Doc.26-5, p.15; Doc.26-3, p.84; Doc.26-6, pp.31-33; Doc.26-4 pp.12, 16; Doc.26-7, p.26]. All in one motion, Gregory drew his Taser with his left

---

[13] Deputy Gregory includes this statement solely because Plaintiff insists he responded saying words akin to, "You ain't going to work" [Doc.26-7, p.11], thereby indicating Gregory heard a remark about work.

[14] Again, the parties' details differ with deputies stating Plaintiff turned and advanced toward the bed, and Plaintiff contending he simply reached for his pants which were not on the bed. Regardless, there is no dispute that Plaintiff is near the bed where the gun lay and that he is moving. [Doc.26-5, p.15; Doc.26-3, p.84; Doc.26-6, pp.31-33; Doc.26-4 pp.12, 16; Doc.26-7, p.26 (The pants "would have been *pretty close*, but it wasn't on or near the bed, I don't think; but it would have been pretty -- because *all of it was right there pretty much together*." (emphasis added)].

[15] Plaintiff also acknowledges the threat a gun poses stating, "If I'd've had my gun [at the door], it might have been a whole different situation. I might be dead." [Doc.26-7, p.15].

hand and deployed it at the male who was by the bed and the gun. [Doc.26-3, pp.84, 87, 88; Doc.26-5, pp.16-17; Doc.26-4, pp.12, 16]. Gregory did not issue any warning before deployment. [Doc.26-3, p.88; Doc.26-7, pp.12, 13, 16, 31]. One prong of the Taser struck the male in the upper right chest or shoulder and the other struck a piece of furniture in the room. [Doc.26-3, pp.85, 86; Doc.26-4, pp.23, 24]. Thus, no shock was delivered. [Doc.26-4, pp. 28-29]. The male went to the ground and was handcuffed. [Doc.26-3, p.91; Doc.26-4, p.29]. As soon as Gregory got into the room and could identify the male, he knew it was Dukes Senior, not Junior. [Doc.26-3, p.91]. Deputies conducted a protective sweep of the home to confirm that no one else was inside. [Doc.26-3, p.97; Doc.26-4, p.29].

Plaintiff was escorted out of the home.[16] [Doc.26-6, pp.38-39; Doc.26-4, p.29]. Deputies never cursed at Plaintiff, called him racial epithets or other names, said anything derogatory to Plaintiff, or threatened him. [Doc.26-7, pp.36-37].

Detective Wilkinson arrived on scene as deputies were coming out of the house with Plaintiff and had him sit on the tailgate of his truck where he began asking him about Junior. [Doc.26-1, pp.19-21]. Emergency Medical Services were called

---

[16] Plaintiff states both that he was totally naked and, in contradiction, that he had put on pants and pulled them up to his waist though they were not buttoned. [Doc.26-7, pp.11, 31]. The state of Plaintiff's clothing is a fact unknown to deputies until they entered the room to cuff him [Doc.26-3, pp.84, 92; Doc.26-6, p. 38; Doc.26-4, p.21] and is also irrelevant to the use of force.

to remove the Taser barb and arrived and contacted Plaintiff at 5:58am. [Doc.26-6, p.39; Doc.26-4, p.29; Doc.26-15], confirming there were no injuries beyond a small wound to the skin where the probe entered. [EMS records]. Plaintiff recalls he was in handcuffs until the ambulance arrived fifteen minutes later.[17] [Doc.26-7, p.40]. Plaintiff was transported to the hospital at his request. [Doc.26-3, p.99].

The deputies completed narratives regarding the incident along with documentation of their uses of force as required by LCSO.[18] [Doc.26-3, pp.43-45, 98-99; Doc.26-6, pp.28, 29, 40-41; Doc.26-5, pp.18-19; Doc.26-4, pp.13-14, 17-18, 38-41; Doc.26-2, p.38]. The "response to resistance" (RTR) form documents the law enforcement officer(s) involved, the types of resistance encountered, and the control measures employed. [Doc.26-2, pp.38-39; Doc.26-4, pp.17-18, 40-41].

## IV. Training.

Gregory had 700+ hours of training through the law enforcement academy

---

[17] Plaintiff "guess[ed] about at least 20 or 30 minutes, if not longer," but admits, "I don't know." [Doc.26-7, p.34]. EMS records confirm they were dispatched at 05:43:00 and made contact with Plaintiff at 05:58:00, a span of fifteen minutes. [Doc.26-15].

[18] After Junior was not located at the house that morning, Detective Wilkinson completed the probable cause paperwork and sent it to patrol so that deputies coming on shift could continue looking for him over the weekend. [Doc.26-3, p.36]. A warrant was obtained for Junior on May 29, 2019, which Wilkinson also provided to the U.S. Marshal's office since he was considered such a danger. [Doc.26-1, pp.22, 26]. Junior was arrested in July 2019 and pled guilty in September 2019. [Doc.26-1, p.22].

plus additional training through LCSO. [Doc.26-3, pp.11-12, 14-16; Doc.26-12, ¶¶4-10, pp.7-8]. He was trained on Fourth Amendment issues. [Doc.26-2, pp.17-18, 20-21; Doc.26-4, p.36; Doc.26-6, p.6]; Doc.26-11, ¶6. His training is extensive and includes additional training beyond that of other deputies because of his service on the Tactical Response Unit (TRU). [Doc.26-14, #5]. Gregory has completed multiple trainings to be an instructor and specifically completed another 40 hours of training to become a Field Training Officer for LCSO in March 2019. [Doc.26-12, ¶7, p.7].

Deputy Gregory was first trained on the Taser when he was in the law enforcement academy in 2009. He has had multiple trainings since that time which included slideshows, scenarios, and physical hands-on training deploying the Taser. [Doc.26-3, p.17]. Refresher training likely included reviewing the policy, seeing a slide-show on the way to use the Taser, and then actual practice deploying the Taser. [Doc.26-6, pp.16-17].

## V.     Plaintiff's agency complaint against Chase Gregory

On May 29, 2019, Plaintiff made a formal written complaint with LCSO against Deputy Chase Gregory alleging he used excessive force during the events at 900 Patterson Street on the morning of May 25, 2019, Complaint #19-05-IN-024. [Doc.26-8, pp.10-11, 33-40]. Sheriff McCallum designated Lieutenant Tummond

to investigate the complaint, which became Investigation 19-FI-08.[19] [Doc.26-8, pp.16, 19, 32]. Lieutenant Tummond is required to review and understand Sheriff's Office policies and procedures and refers to these in determining the outcome of an investigation. [Doc.26-8, p.7]. Investigations may be substantiated, unsubstantiated, exonerated, unfounded, and policy failure. [Doc.26-8, p.8]. Investigation 19-FI-08 was concluded on September 19, 2019, with Lieutenant Tummond finding Deputy Gregory "Exonerated"[20] of any violation of GO 1105.3 B 6 - Excessive or Unnecessary Force Not Resulting in Injury. [Doc.26-8, pp.23-26, 31; Doc.26-13, #6].

## SUMMARY OF THE ARGUMENT

Deputy Gregory did not violate Plaintiff's Fourth Amendment Rights. Under the totality of the circumstances, a reasonable officer could have believed that Plaintiff's overt physical actions—including verbally responding followed by unlocking and opening his door before retreating back inside without further comment—constituted implied consent for the officers to enter the home. Deputy Gregory's subsequent split-second decision to use a Taser one time—after Plaintiff,

---

[19] Sheriff McCallum did not order an investigation of the entry into the home and thus it was not part of the investigation. [Doc.26-8, pp.27-28]. Though Lt. Tummond could have expanded the investigation, he did not see the entry as a glaring situation with additional policy violations. [Doc.26-8, p.28].

[20] "Exonerated" means "The act occurred and it was lawful." [Doc.26-8, p.9].

who was believed to be the suspect in a violent felony, refused to comply with verbal commands and, in violation of orders, moved in proximity to a visible handgun—was also reasonable. Finally, his brief detention of Plaintiff was lawful based on reasonable suspicion to detain, probable cause to arrest for obstruction, and also for officer safety even as a non-suspect.

Even if constitutional violations occurred, Deputy Gregory was protected by qualified immunity. No clearly established law exists that would have notified Deputy Gregory that his actions in these factual circumstances were unlawful. The district court's denial of summary judgment/qualified immunity should be reversed. There are no material facts in dispute and Deputy Gregory is entitled to summary judgment as a matter of law.

## ARGUMENT

At issue for this appeal are the claims against Deputy Chase Gregory in Counts III and IV of Plaintiff's First Amended Complaint [Doc.11]:

Count III - §1983 claim for unlawful entry, and

Count IV - §1983 claim for excessive force, and unlawful seizure.[21]

---

[21] Plaintiff confirmed that Count IV was a single claim with the alleged excessive use of force claim being subsumed into his initial Fourth Amendment claim of unlawful detention. [Doc.30, p.18, and fn.8.]. However, the district court treated it as two separate claims so Deputy Gregory does here as well. [Doc.42, p.4, fn.5].

# I. Deputy Gregory did not violate Plaintiff's Fourth Amendment rights when he entered his home.

In Count III, Plaintiff asserts that Deputy Gregory's entry into his home without a warrant violated his Fourth Amendment rights. It did not.[22]

## A. *Plaintiff's actions reasonably conveyed consent to enter his home.*

The Fourth Amendment protects individuals from objectively unreasonable searches and seizures. *United States v. Braddy*, 11 F.4th 1298, 1307 (11th Cir. 2021) (citing U.S. Const. Amend. IV).

While entry into a home without a warrant is generally unreasonable, *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1328 (11th Cir. 2006) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)), warrantless entry does not violate the Fourth Amendment where voluntary (non-coerced) consent is provided. *Id. See also United States v. Johnson,* 608 Fed. Appx. 764, 767 (11th Cir. 2015) ("A warrantless search or entry does not violate the Fourth Amendment where there is voluntary consent given by a person with authority.") (cleaned up); *Illinois v.*

---

[22] The district court found that even under Plaintiff's version of events,

> Gregory's entry was neither 'worse than gross negligence' nor 'more reprehensible and unacceptable than mere intentional conduct." There is no showing of anything more egregious than Deputy Gregory's misconstruing Dukes's conduct as consent to enter.

[Doc.42, p.5]. It granted statutory immunity to Gregory on the state law claims but, inexplicably, found that disputed issues of fact prevented summary judgment for the constitutional claim.

*Rodriguez*, 497 U.S. 177, 181 L.Ed.2d 148 (1990) ("The prohibition [against warrantless entry into a home] does not apply…to situations in which voluntary consent has been obtained."). Deputy Gregory's entry was lawful because Plaintiff's actions implied consent for Gregory to enter the home.

Consent is an "objective" inquiry that neither turns on the suspect's subjective intent nor the officer's beliefs. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The [objective] standard [asks]…what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); *Fuqua v. Turner*, 996 F.3d 1140, 1151 (11th Cir. 2021) (same); *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 668 (5th Cir. 2003) (explaining that "the primary inquiry in determining the scope of consent is what a reasonable, objective, third party observer would have understood the suspect had consented to.").

Plaintiff's outward conduct must be considered only in the context of the "totality of the circumstances" actually known to Deputy Gregory. *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 524 (11th Cir. 2019) (it is necessary to "analyze all the circumstances of an individual's action to determine whether in fact there was consent."); *Hernandez v. Hansell*, 2016 WL 8943279, at 1 (M.D. Fla. 2016), *aff'd*, 695 Fed. Appx. 523 (11th Cir. 2017) ("the Court … considers only those facts known to [the deputies] at the time of the incident.") (Emphasis added).

Under this test, neither a specific verbal "request" for entry, nor explicit verbal

permission to enter, needed occur. [Doc.28, pp.28, 31, and fn.21 (citing *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 524 (11th Cir. 2019) (consent implied from resident's physical conduct despite no explicit request for entry having been made)); *United States v. Hankerson*, 2022 WL 11771569, at 2 (M.D. Fla. Oct. 20, 2022) (Consent "does not need to be expressly given but may be fairly inferred from the totality of the circumstances.") (citing *Birchfield v. North Dakota*, 579 U.S. 438, 476 (2016)).[23]

Relevant here, "consent can be implied [by affirmative physical conduct], such as where a defendant has yielded the right- of-way in response to an officer's request for admission to the home." *Jiles v. Lowery*, 2023 WL 2017354, at *3 (11th Cir. Feb. 15, 2023) (citing *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002)).

As one court summarized:

> We know that the mere failure to object to an officer's entry into the home does not constitute valid consent to the entry, but that some affirmative indication, even if non-verbal, that the officers are welcome to enter may be enough.

*Fuqua*, 996 F.3d at 1153 (11th Cir. 2021).

---

[23] Thus, similarly, a resident's mere "failure to object" to entry does not constitute consent, but "it is a factor to consider." *Judd*, 941 F.3d at 524 (11th Cir. 2019). *See also Fuqua*, 996 F.3d at 1152 (11th Cir. 2021) ("an officer does not obtain valid consent…merely because the homeowner fails to verbally or physically object to his entering the home.").

*Ramirez-Chilel* is instructive. In that case, police officers approached a residence, and then asked for permission to search the house. In response, the owner "yielded the right-of-way" to allow them in. *Ramirez-Chilel*, 289 F.3d at 747. Finding that the owner's physical actions constituted consent, the Eleventh Circuit distinguished cases such as *United States v. Gonzalez*, 71 F.3d 819, 830 (11th Cir. 1996), which had broadly held that "it is inappropriate to sanction entry into the home based upon inferred consent," by explaining that "a distinction [exists] between the failure to object when officers follow someone into their home and the act of 'yielding the right-of-way' to officers at the person's front door." *Id*. at 752. The Court held that there was no Fourth Amendment violation because while the owner did not give the officers "explicit verbal consent ... to enter, the officers did receive some sort of implied consent to enter from Ramirez-Chilel's body language." *Id*. at 752 ("we … find that Ramirez-Chilel demonstrated his consent to entry by 'yielding the right-of-way' for the officers to enter.").

Similarly, in *Holmes v. Kucynda*, 321 F.3d 1069 (11th Cir. 2003), police responding to a domestic disturbance knocked on the suspect's apartment door. When a man answered, the officers asked if they could enter the apartment. "Although the man did not respond verbally, he opened the door and took a step backward, indicating acquiescence." The Eleventh Circuit again held that such an overt physical act was sufficient for officers to reasonably infer that consent had been

given. *Id*. at 1079 ("the officers' entry into [the] apartment [in these circumstances] did not violate Holmes' constitutional rights.").

And in *Judd*, 941 F.3d 504 (11th Cir. 2019), the Eleventh Circuit held that a resident's physical act of "open[ing] the door wide and stepp[ing] back" was a sufficiently clear overt act for the officers to infer consent, and confirmed both that "consent need not be verbal to be valid" and that "[n]on-verbal cues can signal consent." *Id*. at 525.[24] *See also United States v. Stiner*, 551 F. Supp. 2d 1350, 1357 (M.D. Fla. 2008) ("the Court concludes Ms. Bartoletta implicitly consented to entry of the officers into the home … [by the overt act of] stepping aside at the front door and pointing to the location of the bedroom where the Defendant could be found"). Physical actions alone can thus constitute consent under the Fourth Amendment.

Here, the undisputed facts demonstrate that Plaintiff engaged in objective affirmative physical actions that a reasonable officer could believe indicated consent

---

[24] Although a "request for admission" is often part of the "totality of the circumstances" considered by courts, an explicit request is not *required*. In *Judd*, for example, no explicit request to enter was made but consent was implied from the resident's conduct (not merely their silence). Officers merely informed the resident they were there to make an arrest and the resident opened the door and stood back—sufficiently suggesting consent. By contrast, other decisions have held even after an explicit request to enter, that some physical conduct is not enough. *See United States v. Gonzalez*, 71 F.3d 819 (11th Cir. 1996). It is the "totality of the circumstances" that controls and no bright-line rule about a "request for admittance" exists. *Judd*, 941 F.3d at 524 (11th Cir. 2019) (it is necessary to "analyze all the circumstances of an individual's action to determine whether in fact there was consent.").

to enter. Specifically, in response to the uniformed deputies knocking and announcing their presence, a person inside the home was heard responding. A black male then unlocked and opened the door, and retreated inside while leaving the door open in a manner that suggested an invitation to enter. Indeed, it appeared that the man's *sole purpose* in opening the door and then retreating inside was to permit entry.[25]

It is often difficult for the context of human actions and body language to be reduced to written words. But here, Plaintiff confirms that Deputy Gregory's interpretation of his objective actions was correct: Plaintiff admits that he *intended* his actions to convey an invitation to enter. He simply argues that he mistakenly *thought it was his son* he was inviting inside. [ECF-11, ¶31 ("[Plaintiff] believed his son was home … and walked to the back door to let his son in the house.")]. Deputy Gregory's interpretation of Plaintiff's outward actions was thus not only "objectively reasonable," it was an accurate interpretation of the "come inside" message Plaintiff *intended to convey*.

Plaintiff's private/uncommunicated/secret misconception about *whom* he was

---

[25]     Other facts known to Deputy Gregory included that (1) Probable cause existed to arrest Junior for a violent felony; (2) Junior lived at this house; (3) Junior was reportedly inside the house at this time; (4) Junior was known to use and reportedly was currently using Molly, an unpredictable drug; and (5) there had been no show of force to coerce entry into the home.

inviting inside is irrelevant because it could not have been known by Gregory. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (consent is an "objective" standard determined by what a reasonable officer would have "understood by the exchange"). As in *Ramirez-Chilel*, *Holmes,* and *Judd*, Plaintiff's objective actions were intended to communicate—and succeed in clearly communicating—consent to enter. Deputy Gregory did not violate Plaintiff's rights by correctly interpreting his actions.

Because "[t]he ultimate touchstone of the Fourth Amendment is reasonableness … [and] to be reasonable is not to be perfect," "the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Braddy*, 11 F.4th at 1308 (11th Cir. 2021). Searches and seizures based on reasonable factual mistakes therefore do not violate the constitution. *Id*. ("A mistake may be of either fact or law [without violating the Fourth Amendment] so long as that mistake is objectively reasonable"). Any mistake as to Plaintiff's intent was, at the very least, reasonable in the circumstances.

Finally, where, as here, produce "some evidence" of consent, the plaintiff bears the burden to prove that no reasonable officer could have believed that consent was provided. *See Judd*, 941 F.3d at 523 (11th Cir. 2019) ("In a § 1983 action, the plaintiff bears the burden of persuasion on every element…. once [the defendant] came forward with some evidence that the consent exception applied (which he did),

it became [plaintiff's] burden once more "to show….that her father never consented [to the entry]."). Plaintiff cannot demonstrate that no reasonable officer could have believed he consented to the entry.[26] Deputy Gregory did not violate Plaintiff's Fourth Amendment rights and the district court therefore erred in denying him summary judgment.[27]

---

[26] The opinions of fellow law enforcement officers and of police practices expert Paul Kiley, also interpreting Plaintiff's actions as nonverbal consent under the totality of the circumstances, also demonstrate the reasonableness of Deputy Gregory's understanding of the exchange.

Any opinion of Plaintiff's police practices expert Clark fails to take into account the information known to Deputy Gregory. Clark's recitation of events [Doc.37-7, beginning at p.13], focuses on what Mr. *Dukes* heard or saw, not on the information known to *Deputy Gregory*. The plaintiff's outward conduct must be considered only in the context of the "totality of the circumstances" *actually known to officers*. *See Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 524 (11th Cir. 2019); and *Jackson v. West,* 787 F.3d 1345, 1358 (11th Cir. 2015) ("Expert report which suggested "deliberate indifference *across the board"* was defective because it did not address the subjective knowledge possessed by each individual defendant.").

[27] Any criticism that Deputy Gregory is using "his version" of the events for the analysis is undeserved. Though the Court is required to view the facts in the light most favorable to Plaintiff, it "considers *only those facts known to Defendants* [ ] at the time of the incident." *Hernandez,* 2016 WL 8943279, at *1 (M.D. Fla. 2016), *aff'd,* 695 Fed. Appx. 523 (11th Cir. 2017) (emphasis added). Deputy Gregory's analysis still considers the events in the light most favorable to Plaintiff (*e.g.,* we can assume that Plaintiff merely "cracked" the exterior door and that his subjective intent was to open it for his son, that the bedroom door was not closed, or that he believed he was telling officers what he was doing), but Defendants do not factor in any allegation by Plaintiff that is immaterial or contrary to the record evidence *known to Deputy Gregory* at the time of the events. *Hernandez,* 2016 WL 8943279, at *1. *See also Hammett v. Paulding Cnty.,* 875 F.3d 1036, 1050 (11th Cir. 2017) (The plaintiff's theory of surrender and retreat, while a possible inference from the record, did not change the critical facts known to the officers and undisputed by the plaintiff

**B. *Deputy Gregory is entitled to qualified immunity.***

Even if constitutional violations occurred, Deputy Gregory was acting under color of state law[28] [Doc.48, p.9, fn.7] and within his discretionary authority[29] and is protected by the affirmative defense of qualified immunity. To defeat this immunity and summary judgment, it is incumbent upon Plaintiff to demonstrate Deputy Gregory violated clearly established law. *See Patel v. Lanier Cnty. Georgia,* 969 F.3d 1173, 1181 (11th Cir. 2020).

### 1. Overview of Qualified Immunity.

Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation omitted). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation,

---

that they knocked and announced, announced their identity inside the dark house, and gave orders with which the decedent did not comply.).

[28]    *See, e.g., Almand v. DeKalb Cnty., Ga.*, 103 F.3d 1510, 1513 (11th Cir.1997) (required for a claim under 42 U.S.C. §1983).

[29]    A government official acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Roberts v. Spielman,* 643 F.3d 899, 903 (11th Cir. 2011). Making arrests are generally part of the duties of a law enforcement officer. *Pair v. City of Parker FL Police Dept.,* 383 Fed. Appx. 835, 839 (11th Cir. 2010).

protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (cleaned up).

To qualify for immunity, the "government official [must first prove] that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294–95 (11th Cir. 1998) (quotation omitted); s*ee Patel v. Lanier Cnty. Georgia,* 969 F.3d 1173, 1181 (11th Cir. 2020). There is no dispute that Gregory was acting within his discretionary authority as a deputy with the Levy County Sheriff's Office as all times relevant to this action.

"[T]he burden [thus] shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194; and *See Patel v. Lanier Cnty. Georgia,* 969 F.3d 1173, 1181 (11th Cir. 2020). To meet that burden, Plaintiff must show "(1) that the ... official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Fuqua v. Turner*, 996 F.3d 1140, 1149 (11th Cir. 2021) (cleaned up); and *Patel v. Lanier Cnty. Georgia,* 969 F.3d 1173, 1181 (11th Cir. 2020). The two prongs can be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). As demonstrated in the preceding section, Deputy Gregory's actions did not violate Plaintiff's Fourth Amendment rights. Nonetheless, assuming *arguendo* a constitutional violation occurred, Plaintiff is unable to prove the second element, that Deputy Gregory

violated clearly established law. He did not.

For a right to be clearly established, "the contours of [the] right [must be] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). This Court has identified three ways for the law to be clearly established:

> First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the [statute] that prior case law is unnecessary.

*Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012) (cleaned up). Courts "look to the law as it was interpreted at the time of the challenged conduct by the United States Supreme Court, the Eleventh Circuit, and the Georgia Supreme Court." *Sheba Ethiopian Rest., Inc. v. DeKalb Cnty., GA*, 2023 WL 3750710, at *5 (11th Cir. June 1, 2023) (citing *Terrell* at 1255).

"For the law to be clearly established to the point that qualified immunity does not protect a government official, pre-existing law ***must dictate, that is, truly compel*** (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *King v. Pridmore*, 961 F.3d 1135, 1145 (11th Cir. 2020).

The Supreme Court has emphasized the "longstanding principle that clearly established law should not be defined at a high level of generality." *White v. Pauly*,

580 U.S. 73, 79 (2017) (quotation omitted). "[T]he clearly established law must be particularized to the facts of the case." *Id*. (quotation omitted). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id*. (cleaned up); *see also District of Columbia v. Wesby*, 583 U.S. 48 ("We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.") (quotation omitted)). Rather, "the clearly established law must be particularized to the facts of the case." *White v. Pauly,* 580 U.S. 73, 79 (2017) (quotation omitted).

> **2. Case law clearly establishes that consent to enter a home may be implied by a resident's physical conduct, including opening a door and stepping aside to allow entry.**

There is no doubt that an officer violates the Fourth Amendment by making a warrantless entry into a home without consent (or another recognized exception to the warrant requirement). But such a "high-level" analysis is both unhelpful and inappropriate. The issue here is whether Plaintiff's overt physical acts so clearly did not constitute consent under established case law that "every reasonable official would have understood" that consent had not been provided. As discussed in Argument Section I.A. above, the opposite is true.

Case law clearly establishes that that consent may be inferred from overt physical acts. *See e.g. Fuqua*, 996 F.3d at 1153 (11th Cir. 2021); *Ramirez-Chilel*, 289 F.3d at 752 (11th Cir. 2002); *Holmes v. Kucynda*, 321 F.3d 1069 (11th Cir. 2003); *Judd*, 941 F.3d at 525 (11th Cir. 2019), and Section I.A. above, generally. And as discussed above, physical acts such as opening a door and stepping aside, as happened here, have been explicitly held to constitute consent. *See Kucynda* (resident opening door and stepping back constituted consent).

In *Fish v. Brown*, 838 F.3d 1153, 1165–66 (11th Cir. 2016), for example, the plaintiff responded "all right" in response to an introduction of law enforcement officers. This Court upheld the district court's application of qualified immunity to the deputies entering the plaintiff's home finding that "any reasonable person would have considered" the plaintiff's affirmative response "as explicit verbal consent for the officers to enter his home." Similarly, in the case at bar, Plaintiff's affirmative acknowledgment that "I'm coming" in response to deputies knocking and announcing coupled with his action of opening the door, provided that same reasonable belief to Deputy Gregory.

The case most similar factually to the circumstances presented Deputy Gregory is from another jurisdiction. Though not precedential, it is persuasive. In 2022, a district court in West Virginia found qualified immunity entitled deputies to summary judgment on an unlawful entry because they reasonably believed they had

implied consent to enter when the door opened in response to a knock and announce.

The circumstances were nearly identical to those facing Deputy Gregory:

> [T]here is no material dispute as to the facts as perceived by the officers. They banged on the door and announced their presence, identifying themselves as law enforcement officers. The door was locked and secured from the inside when they began their announcement. After the second K-9 announcement, the door opened. The door had a handle on the outside without a standard doorknob, and the door opened outward. **Any reasonable officer would presume that the door opened because an occupant of the house opened it in response to their knock and announce**.
>
> *       *       *
>
> [T]he relevant facts are those perceived by the officers at the time. They perceived that the previously locked door opened in response to their knock and announce.

> A person opening a door would not necessarily constitute consent to enter. Any citizen might open a door in response to a knock, expecting the person on the other side of the threshold to explain the reason for their visit prior to determining whether to invite them in. In these circumstances, however, **the door swung open *without anyone waiting on the other side to limit or specify the scope of their consent* to entry or an interaction with the deputies. Anyone at the door would presume that someone opened the door, then stepped back into the darkened house away from the entrance**.

> To the extent that there is any doubt about whether the Kanawha Deputies violated the Plaintiffs' Fourth Amendment rights by entering the house when the door opened as they conducted a K-9 knock and announce, they are protected from liability by qualified immunity. **The Fourth Circuit has not considered a case with sufficiently analogous facts to definitively determine whether entering a residence when a previously locked door opens in response to officers knocking, but no one comes to the door or interacts directly with the officers in any way, violates the Fourth Amendment**. Thus, the Court finds that any mistake of law was reasonable, because there is no clearly established law to inform officers that opening a door in response to a knock and announce, then stepping away from the

entrance, does not constitute implied consent to enter. Likewise, any mistake of fact was reasonable. **The question does not turn on whether the Plaintiffs actually intended to consent to the Defendants' entry,** and so their testimony that no one unlocked the door is irrelevant in the face of the undisputed evidence that the door was locked, then opened as the officers conducted their knock and announce.

*Quinn v. Zerkle,* 2:21-CV-00421, 2022 WL 15316600, at *7–8 (S.D.W. Va. Oct. 26, 2022) (Emphasis added).[30]

Indeed, just last year this Court again confirmed that consent *can be implied by physical conduct. Jiles v. Lowery*, 2023 WL 2017354, at *3 (11th Cir. Feb. 15, 2023) (citing *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002)).

Here, the district court made several errors in its analysis of Deputy Gregory's entitlement to qualified immunity. For example, the Court reasoned that "a jury might conclude Dukes did not even see Deputy Gregory (who was against the house by the railing) and could not have implied permission for him to enter." [Doc.42, p.8]. But this incorrect standard wrongfully focuses on Plaintiff's subjective knowledge. The issue not what Plaintiff *subjectively understood*, but rather what message his *objective actions* conveyed. The district court's supporting citation to

---

[30] The *Quinn* court all but held that these circumstances indeed constituted implied consent and that no constitutional violation occurred. It declined to make such holding, however, because the finding was not necessary to the determination of the case. *Quinn,* 2:21-CV-00421, 2022 WL 15316600, at *8, fn.6 (S.D.W. Va. Oct. 26, 2022).

*United States v. Gonzalez*, 71 F.3d 819, 829 (11th Cir. 1996) (confirming that consent must be "product of an essentially free and unconstrained choice" and that a "failure to object" does not constitute consent) is unhelpful. There is no issue of coercion in this case and entry was not made based solely on Plaintiff's failure to object. Indeed, the distinction between a mere "failure to object" and the presence of physical conduct implying consent to enter was expressly recognized in *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) ("a distinction [exists] between the failure to object when officers follow someone into their home and the act of 'yielding the right-of-way' to officers at the person's front door."). *Gonzalez* therefore does not clearly establish that Deputy Gregory's actions were unlawful under the facts of this case.

The district court also incorrectly concluded that a jury could find that any conduct implying consent to enter "did not extend to Gregory's walking through the kitchen hall to the bedroom, behind a naked Dukes." [Doc.42, p.8]. But there are no facts which would support such a distinction. Plaintiff opened the door and immediately retreated back inside the home. Nothing occurred in between that would establish that Plaintiff intended for deputies to solely enter the home, but not follow where he was leading. Certainly no case law clearly establishes that officers cannot follow a person whose very actions suggested that they should do just that.

The district court ultimately cited no controlling law demonstrating that Deputy Gregory's actions were unlawful under the particular facts of the case. Rather, the court cited only cases finding violations in other circumstances—such as *Gonzalez*. The district court for example also cited *Moore v. Pederson*, 806 F.3d 1036, 1052-53 (11th Cir. 2015), for its holding that "failing to close [a] door 'without any separate affirmative act…does not amount to consent to enter[.]" But, again, these are not the facts of this case. This case does not involve a mere failure to object/failure to act as in *Gonzalez* and *Pederson*—and such cases therefore do not clearly establish that Gregory's home entry was unlawful in this case.

Finally, the district court suggested that the *magnitude* of the aperture of a door could be determinative of consent. [Doc.42, p.9]. Even if this were so, Deputy Gregory would still be entitled to qualified immunity as no clearly established law existed to inform officers that opening a door at least "x" inches was required.

At a minimum, it was reasonable for Deputy Gregory to believe that he had implied consent based upon Plaintiff's affirmative physical actions. *See Santana v. Miami-Dade Cnty.,* 688 Fed. Appx. 763, 768 (11th Cir. 2017); and *Whittier v. Kobayashi,* 581 F.3d 1304, 1308–09 (11th Cir. 2009) ("The issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion.") (Internal citation omitted). This is all that is necessary for qualified immunity to apply. Whether his belief was ultimately mistaken is

immaterial. *Whittier,* 581 F.3d at 1308.

Binding jurisprudence remains devoid of any ruling that requires an explicit request for admittance for consent to be inferred by one's actions, or that a door be unlatched any specific distance to be considered "opened." It is established, however, that consent can be implied by physical conduct. Deputy Gregory is entitled to the affirmative defense of qualified immunity and to summary judgment as a matter of law on Plaintiff's claims for unlawful entry.

## II. Deputy Gregory did not violate Plaintiff's Fourth Amendment rights when he used a Taser on a noncompliant subject.

In Count IV Plaintiff asserts that Deputy Gregory violated his Fourth Amendment rights by using his Taser, allegedly excessive force. Once again, Deputy Gregory did not.

### A. *Deputy Gregory's Use of a Taser was reasonable in the circumstances.*

"Although suspects have a right [under the Fourth Amendment] to be free from force that is excessive, they are not protected against a use of force that is necessary in the situation at hand." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quotation omitted); *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) (force reasonably proportionate to the situation is not unlawful).

Excessive force claims are thus "evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier v. Katz*,

533 U.S. 194, 207 (2001). "That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." *Torres v. Howell*, 2022 WL 1664355, at 2 (11th Cir. May 25, 2022). This inquiry requires "careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) ("Because the test of reasonableness … is not capable of precise definition or mechanical application, we must slosh our way through the fact- bound morass of reasonableness.") (cleaned up).

To aid in the analysis of the reasonableness of force, the Supreme Court and this Court have developed six guiding factors to determine whether force was excessive: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, (3) whether he is actively resisting arrest or attempting to evade arrest by flight, (4) the need for the application of force, (5) the relationship between the need and amount of force used, and (6) the extent of the injury inflicted. *See Graham v. Connor*, 490 U.S. 386, 396 (1989); *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (*citing Lee*, 284 F.3d at 1197-98). "A mechanical application of these factors is not appropriate" as the factors are only contextual considerations that may apply differently in each circumstance. *Scott v. Harris*, 550 U.S. 372, 386 (2007) (Ginsburg, concurring);

*Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010) (cleaned up). "In conducting this analysis, the only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Helm v. Rainbow City, Alabama*, 989 F.3d 1265, 1273 (11th Cir. 2021) (cleaned up) (citing *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009)).

The circumstances confronting Deputy Gregory were tense. Deputies were there to arrest Plaintiff's son for a violent felony. The son had a lengthy criminal history and was known to use, and reportedly was using, drugs at the time. After entering the unlit home, Gregory could not discern the identity of the male who had opened the door and was retreating but reasonably believed it could be the suspect. Gregory also did not know the suspect's intent since he had opened the door to allow entry, but did not greet them. It was possible that the deputies had been lured inside for ambush.

Outside the bedroom door, the (at the time) unidentified black male refused to show himself and refused to show his hands, but an opening in the door showed that the person was in close proximity to a handgun. It was also unknown whether anyone else was in the room or in the house. Plaintiff continued to refuse requests to show himself. When Gregory saw Plaintiff move in the vicinity of the bed/gun, he

reacted with reasonable force: a single Taser discharge.[31]

Viewed in the context of the six guiding factors:

(1) the "severity of the crime" being investigated was high—the violent beating of the suspect's pregnant girlfriend;

(2) the suspect posed "an immediate threat to the safety of the officers" in light of his refusal to comply with commands, proximity to and movement around a handgun, and suspected drug use

(3) the suspect was "actively resisting" by failing to follow the officer's clear commands;

(4) force was "needed" in the moment to prevent the suspect from acquiring the handgun and escalating the situation to a potentially deadly encounter;

(5) the "amount of force" used was minimal, a single Taser deployment (that failed to connect; and

(6) Plaintiff suffered virtually no injury[32] from the Taser deployment—which

---

[31] To Gregory's credit, he had the presence of mind and judgment to pull and deploy his Taser with his left hand instead of discharging the firearm he was already holding in his right. "[I]t might have been a whole different situation. [Plaintiff] might be dead." [Doc.26-7, p.15]. Police practices expert Paul Kiley opines: "It was very responsible thinking in a highly stressful situation for the deputy [ ] to deploy a taser to gain control of Mr. Dukes Sr. rather than lethal use of force." [Doc.27-1, p. 9, ¶9].

[32] Plaintiff was cleared by EMS and went to the hospital only at his own request. Any discussion of Plaintiff's emotional injuries (which culminated a year later with George Floyd's death) [Doc.38, p.7], is irrelevant to the use of force analysis which

did not connect.

Deputy Gregory's single use of non-lethal force (a Taser) in the tense and rapidly occurring circumstances confronting him was reasonable. This is true even if no weapon were known to be present. *See Barfield v. Rambosk,* 641 F. App'x 845 (11th Cir. 2015) (taser shock did not violate the plaintiff's constitutional rights where he refused commands, resisted arrest, and reached towards his waistband, which the officer feared might have indicated an intent to reach for a weapon); *Torres v. Howell*, 2022 WL 1664355, at *4 (11th Cir. May 25, 2022) ("An officer need not wait until there is a physical struggle for control of [a] weapon before a situation presents an imminent danger of serious physical injury."); *Moore v. Gwinnett Cnty., 805 F. App'x* 802, 809 (11th Cir. 2020) (finding "a single taser shock in this situation was not disproportionate to the need for force" where a suspect failed to comply with multiple commands to place her hands behind her back and submit to arrest); *Anthony v. Coffee Cnty.*, 579 F. App'x 760, 766 (11th Cir. 2014) (use of a taser was not an unreasonable split-second decision because although the arrestee was not belligerent, he was uncooperative and refused an officer's order); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (permitting an officer to deploy his Taser against an unarmed and non-violent arrestee who failed to follow reasonable

---

considers the *physical* injury inflicted as one of six factors. *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

instructions); *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) (concluding the use of a taser was reasonable to effectuate the arrest of a suspect who was hostile, belligerent, and uncooperative).

Validating the reasonableness of the use of a non-lethal Taser in the circumstances presented Deputy Gregory, this Court has approved even deadly force in similar circumstances. *See Hammett v. Paulding Cnty.*, 875 F.3d 1036, 1051 (11th Cir. 2017) (finding the use of deadly force reasonable when Hammett disobeyed an officer's instruction to show his hands and moved aggressively towards the officer, despite finding out after the fact that Hammett did not have a deadly weapon); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (deadly force was reasonable when the officer was "suddenly confronted" by the suspect and "forced to decide in a matter of seconds whether to deploy deadly force").

The reasonableness of Deputy Gregory's use of force is not vitiated by Plaintiff's claims that he made certain statements such as his identity, his son's absence, or his intent to reach only for pants. Accepting all as true, such remarks are immaterial to and not determinative of summary judgment. Whatever Plaintiff *may have said*, there is no evidence that Deputy Gregory heard or understood any words. The only words any deputy in the home could comprehend were the male's asking

why, what were they doing, and going to work.[33]  [Doc.26-3, pp.77-78; Doc.26-6, pp.27-28; Doc.26-4, p.10]. *See, e.g., Shepard v. Hallandale Beach Police Dept.,* 398 Fed. Appx. 480, 482, 483, fn.1 (11th Cir. 2010) (upholding summary judgment for officer who did not hear the plaintiff ask for a warrant, and finding no error given that fact not contradicted by evidence or internally inconsistent) (Internal citation omitted). Plaintiff does not, and cannot, demonstrate evidence to the contrary.

Nor is it contested that Plaintiff's identity was not known until after the Taser was deployed and deputies entered the room. Despite Plaintiff's acknowledgment that he and Gregory were familiar with each other, at no time does Plaintiff state he could see sufficiently well to recognize Gregory or call him by name until after he was handcuffed. [Doc.38, p.4; and Doc.26-7, pp.9+ referring to deputies as "they" and not to Gregory by name]. The only artificial light was from Plaintiff's phone [Doc.38, p.3]; Plaintiff could see well enough to make them out as sheriff's deputies. [Doc.26-7, p.29, ll.14-18]. Critically, Plaintiff admits that he recognized the outfits and knew they were deputies [Doc.26-7, p.29], that they were giving him directives to "get on the ground" [Doc.26-7, pp. 10, 27], and that he did not comply because he knew *he* was "in no trouble." [Doc.26-7 p. 27].

---

[33] The fact that Deputy Murphy, standing outside at the open window, may have heard Plaintiff say he was naked and needed to get pants [Doc.38, p.4] does not impute knowledge to Gregory. Nor would such knowledge be material to the substantive elements.

Finally, any subjective intent on the part of Plaintiff merely to don pants[34] does not negate Gregory's observation that the male repeatedly refused to obey commands and moved[35] in proximity to an unholstered gun on the bed.[36] *See Leonard v. Silva,* 21-60627-CIV, 2022 WL 18493119, at *11 (S.D. Fla. Dec. 26, 2022), *aff'd sub nom. Leonard v. Tony,* 23-10244, 2023 WL 6142188 (11th Cir. Sept. 20, 2023) (Deputies entitled to "qualified immunity because it is reasonable, and therefore constitutionally permissible, [ ] to use deadly force against a person who poses an imminent threat of serious physical harm to the officer or others. [Deputies] were not required to try and divine Plaintiff's subjective intent or wait and see what might happen.") (Cleaned up).

Whether Plaintiff was standing or sitting, whether Plaintiff walked straight or at an angle, and which direction Plaintiff may have turned, are immaterial details

---

[34] It is impossible to tell from Plaintiff's testimony the location of the pants: "right in front of me," "the table between the door and the bathroom," "I can't exactly remember," "I had a lot of little tables [ ] to put my clothes on," "It may have been a dresser," [Doc.26-7, p.25]; "they would have been pretty close, but it wasn't on or near the bed, *I don't think*;" "all of it was right there pretty much together." [Doc.26-7, p.26]. Plaintiff is clear that "when [he] reached for the pants," is when Deputy Gregory deployed the Taser. [Doc.26-7, p.12].

[35] Plaintiff does not deny he was moving, merely that he "wasn't moving a whole lot," that he "moved real easy," and that he "was *trying* to keep eye contact." [Doc.26-7, p.32, ¶¶.11-15 (Emphasis added)].

[36] Plaintiff first states the gun was at the edge of the bed then states it was in the middle. [Doc.26-7, pp.26].

that do not contradict Gregory's observation that the unidentified male refused to comply with deputies' commands and was moving in nearby the gun which formed the basis for his use of force.

There is hearty dispute as to whether the bedroom door was opened or closed after Plaintiff entered the bedroom which Plaintiff contends alone precludes summary judgment for Gregory. It does not. The bedroom door being open, closed, or even nonexistent, is immaterial because regardless of its position, there is no dispute that the subject was actively resisting by not obeying commands and because there is no evidence Deputy Gregory could identify the male as Senior until the Taser was deployed and deputies drew closer. [Doc.26-3, p.91].

Courts do not generally "second-guess the decisions made by police officers in the field." *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "It is doctrinal gospel, that [courts] do not view an officer's actions with the 20/20 vision of hindsight." *Shaw v. City of Selma*, 884 F.3d 1093, 1101 (11th Cir. 2018); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009) ("Our task is not to evaluate what the officers could or should have done in hindsight."). *See also Hammett,* 875 F.3d at 1050 (Internal quotations and

citations omitted) (Though the decedent's death was a tragedy, the testimony of his wife and son, both present at the time of the incident, did nothing to challenge the officers' version of the facts.).

The district court denied summary judgement for Deputy Gregory because it found that dispute existed as to whether Gergory could hear Plaintiff's denials that he was not the person they were after and thus whether Gregory should have realized that it was Dukes Senior and not his son behind the door. [Doc.42, pp.11-12]. But even if Gregory did hear Plaintiff's denials, nothing required him to simply take his word for it and leave. Under the totality of the circumstances, it was reasonable for Deputy Gregory to continue until the identity of the black male in the home could be confirmed. When during this process Plaintiff ignored orders and moved in the vicinity of a gun, Deputy Gregory's use of minimal protective force was reasonable.

The district court also denied summary judgment because "[i]n Duke's version, Gregory entered [his] home without a warrant or consent, then tased and cuffed him despite his statements that he was not the suspect[.]" [Doc.42, p.12]. But this analysis works only if key undisputed facts are ignored. The entry, of course, indisputably involved physical acts consistent with consent. And Plaintiff was certainly not just tased out of the blue—but rather because he ignored commands, because there was a gun lying openly on the bed next to him, and because Plaintiff made movement in close proximity to the gun. "Dukes's version" of events (at least

as apparently understood by the district court) is neither a complete nor accurate version of events known to Deputy Gregory.

"The ultimate touchstone of the Fourth Amendment is reasonableness … [and] to be reasonable is not to be perfect." *Braddy*, 11 F.4th at 1308 (11th Cir. 2021). Because Deputy Gregory's tempered use of force was *reasonable* in the circumstances, it did not violate the Fourth Amendment.

### B. *Qualified immunity for use of Taser*

Even if Deputy Gregory's decision to deploy his Taser is determined to violate the Fourth Amendment, Deputy Gregory is entitled to qualified immunity. The analysis is the same as set forth above in Sections I.B.1. and II.A. above. The law must have been clearly established in May 2019 so as to place Deputy Gregory on notice that his actions in those circumstances were unlawful.

No clearly established law instructed Gregory that the use of a Taser in the circumstances of this case would violate the Fourth Amendment. Indeed, substantial case law confirms that use of a Taser in remarkably similar circumstances is constitutional. If this Court holds that a single deployment of a Taser against a non-compliant suspect of a violent crime who makes a move toward a gun was excessive, it will be the first in this Circuit to do so.

### III. <u>Deputy Gregory did not violate Plaintiff's Fourth Amendment rights when he briefly detained Plaintiff.</u>

Count IV also asserts that Deputy Gregory violated Plaintiff's Fourth

Amendment rights by detaining him. The brief detention was not unlawful.

## A. *Plaintiff's brief detention was constitutionally justified.*

Temporary seizures that fall short of full custodial arrest are afforded only "limited Fourth Amendment scrutiny." *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003). In such cases, courts "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Croom v. Balkwill*, 645 F.3d 1240, 1247 (11th Cir. 2011) ("When evaluating a limited seizure…we look to the 'objective reasonableness' of the law enforcement officer's actions, asking: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?").

Plaintiff was not arrested but merely detained. His detention was lawful as deputies had probable cause[37] to believe he had committed the crime of resisting, obstructing, or opposing the execution of their legal duties by refusing to comply with their commands in violation of § 843.02 *Florida Statutes*. At the time

---

[37] Even "[r]easonable suspicion of criminal activity—a less demanding standard than probable cause—justifies a brief, investigatory detention," *United States v. Philpot*, 2022 WL 1537988, at *2 (11th Cir. May 16, 2022), and exists "when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014).

Gregory issued commands to Plaintiff inside the home, he was performing his legal duty to apprehend a violent suspect and, indeed, had reason to believe that the black male retreating into the home was the violent suspect. Deputy Gregory had a duty to investigate the black male's identity and his commands to Plaintiff in the execution of these duties were lawful.

Plaintiff's noncompliance with such commands was sufficient for a reasonable officer to believe that probable cause existed for the crime of obstruction. *See e.g. Hadden v. Loar*, 2016 WL 10520024, at *7 (S.D. Fla. Dec. 27, 2016) (granting summary judgment in a "mistaken identity" case where the plaintiff "was arrested because, at the time of contact, he was suspected to be [another person/suspect] and, in the course of that encounter, he was alleged to have obstructed the investigation."); and *Rodriguez v. Farrell*, 280 F.3d 1341, 1348-49 (11th Cir. 2002) (finding qualified immunity when officer arrested wrong person who had similar physical features but five-inch height difference with the suspect). Plaintiff's detention for a reasonable amount of time to consider such charges—and whether probable cause was mitigated—was thus lawful.

Separately, the United States Supreme Court has specifically held temporary detentions *non*-suspects to be lawful in circumstances where the interests of officer safety outweigh a minimal intrusion. *Muehler v. Mena*, 544 U.S. 93, 100–02 (2005) (law enforcement acted reasonably by detaining innocent/non-suspect

occupants of a residence in handcuffs for up to three hours while they conducted a search to "minimize the risk of harm to both officers and [the] occupants"); *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981) (same, noting that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."); *Gomez v. United States*, 601 Fed. Appx. 841, 848 (11th Cir. 2015) (recognizing *Summers* was applied to "analyze what a police officer may lawfully do at the scene vis-à-vis detaining and controlling an innocent passenger during a traffic stop of a vehicle or a bystander on the sidewalk watching a fight. *See Hudson v. Hall,* 231 F.3d 1289, 1292 (11th Cir. 2000) (passenger during a traffic stop); *United States v. Clark,* 337 F.3d 1282, 1283 (11th Cir. 2003) (bystander to a fight).

In such cases, this Court has noted that, "[a]s the Supreme Court has recognized, a police officer performing his lawful duties may direct and control—to some extent—the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing."). *See also Lagasse, City of Waterbury*, 2011 WL 2709749, at *7 (D. Conn. 2011) (concluding that "the use of handcuffs to temporarily detain individuals on the scene during an investigation … can be a reasonable protective measure."). *See also Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 469 (S.D.N.Y. 2008) ("The officers were searching the residence for drugs, guns and a drug dealer. It was therefore objectively

reasonable for them to handcuff [the two adult males present] for the sake of the officers' safety and that of everyone else present."); *Riordian v. Joyner*, 2005 WL 752210, at *6 (D.Conn. 2005) ("Handcuffing [the plaintiffs] was also a reasonable protective measure until defendants could rule out the possibility that [the plaintiffs] could access a weapon. Defendants used reasonable force to protect themselves under the circumstances").

Here, it was imminently reasonable under the circumstances (the hunt for the suspect in a violent felony, the discovery of the gun, Plaintiff's unusual behavior, Plaintiff's non-compliance with commands, and the use of force) for Deputy Gregory to temporarily detain Plaintiff while deputies fully assessed the situation and conducted a protective sweep of the home for other occupants. Plaintiff was released after just *15-minutes* when the search/investigation was completed, the scene made safe, EMS arrived to treat Plaintiff's minimal injuries, and it was determined whether to make an arrest for obstruction.[38]

Plaintiff's argument against summary judgment on issues of events occurring inside the house again amount to nothing more than a hypothetical which did not occur: **If** the facts were different (*e.g. if* Gregory had known this was Senior – a

---

[38] Accepting *arguendo* Plaintiff's contention that he was handcuffed as long as 20 or 30 minutes while waiting on emergency medical personnel, and assuming that this was a full arrest, it was still lawful under this same analysis.

condition negated by the record evidence), ***then*** Deputy Gregory's actions in using force and detaining Plaintiff may not have been reasonable. But these are not the record facts. And Plaintiff cannot impute factual knowledge to Deputy Gregory that he did not have. *See, e.g., Graham v. Gagnon,* 831 F.3d 176, 184 (4th Cir. 2016) ("Even assuming events unfolded as Graham asserts, the officers would still not have "actually possessed" information about a conversation they were not in a position to hear.").

### B. *Deputy Gregory is protected by qualified immunity for any improper actions related to Plaintiff's detention.*

Assuming once again for the sake of argument that the brief detention of Plaintiff violated his constitutional rights, Deputy Gregory is entitled to qualified immunity for his actions. As stated above, to overcome his qualified immunity, Plaintiff must demonstrate that the right violated was clearly established at the time of the challenged conduct to a degree of certainty that it *dictated,* not just suggested, the conclusion for Deputy Gregory and "every like-situated, reasonable government agent" that his actions violated federal law in the circumstances." *King v. Pridmore*, 961 F.3d 1135, 1145 (11th Cir. 2020). *See also Fuqua v. Turner*, 996 F.3d 1140, 1149 (11th Cir. 2021) (cleaned up); and *Patel v. Lanier Cnty. Georgia,* 969 F.3d 1173, 1181 (11th Cir. 2020). Plaintiff can point to no such case law.

## CONCLUSION

The district court's Order should be reversed and remanded with instructions to enter summary judgment in favor of Deputy Gregory on all remaining claims against him because Gregory either did not violate Plaintiff's constitutional rights or he is entitled to qualified immunity for his good faith actions.

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,730 words, excluding the parts exempted by Fed. R. App. P. 32(f).

## CERTIFICATE OF TYPE SIZE AND STYLE

The type used is 14-point Times New Roman.

## CERTIFICATE OF SERVICE

Pursuant to 11th Cir. R. 25-3 and General Order 38, on this 12th day of March 2024 this document is being filed electronically and service shall be through the Court's transmission facilities on all persons appearing before this Court; original and four hard copies have been furnished via Federal Express to the Court.

*/s/ Gwendolyn P. Adkins*

 Gwendolyn P. Adkins
(FBN: 0949566)
gadkins@coppinsmonroe.com
jclark@coppinsmonroe.com
kwillis@coppinsmonroe.com

Coppins Monroe, P.A.
2316 Killearn Center Blvd., Suite 202
Tallahassee, FL 32309
Office: 850-422-2420    Fax: 850-422-2730

ATTORNEYS FOR DEFENDANT/APPELLANT
CHASE GREGORY